O9AUWERS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 Cr. 4 (JHR)

5    BEN WERCZBERGER,

6                                        Sentence
              Defendant.
7    ------------------------------x

8
                                         New York, N.Y.
9                                        September 10, 2024
                                         11:45 a.m.
10

11   Before:

12                   HON. JENNIFER H. REARDEN,

13                                       U.S. District Judge

14                          APPEARANCES

15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  DANIEL HARRIS WOLF
          CATHERINE E. GHOSH
18        Assistant United States Attorneys

19   MEISTER SEELIG & FEIN LLP
          Attorneys for Defendant
20   BY:  HENRY E. MAZUREK
          ILANA HARAMITI
21

22   Also Present:

23        Stephanie McMahon, U.S. Probation

24

25

1    (Case called)

2            MR. WOLF:  Good morning, your Honor.  Daniel Wolf and

3    Catherine Ghosh on behalf of the government.  At counsel table,

4    as I understand, invited by the Court, is U.S. Probation

5    Officer, Stephanie McMahon.

6            THE COURT:  Yes.  Hello to you all.

7            MR. MAZUREK:  And good morning, your Honor.  Henry

8    Mazurek and Ilana Haramati on behalf of Ben Werczberger, who is

9    present before the Court.

10           THE COURT:  Okay.  Good morning to you.

11           Please be seated, everybody.  All right.  We're here

12   today for sentencing in the United States versus Werczberger.

13           On April 18, 2024, Mr. Werczberger pleaded guilty

14   pursuant to a plea agreement dated April 13, 2024, to a

15   one-count superseding information S7, charging him with

16   conspiracy to make false statements to a bank in violation of

17   Title 18, United States Code, Section 371.

18           In preparation for today's proceeding, I have received

19   and reviewed the probation office's revised presentence

20   investigation report dated July 12, 2024, including its

21   recommendation addendum.  I've also reviewed the following

22   submissions from the parties:  The defendant's sentencing

23   submission dated August 27, 2024, that consist of letters from

24   Mr. Werczberger and letters from his family, community members,

25   and his physician, also the government's sentencing submission

O9AUWERS

```
 1    dated September 3, 2024.
 2              I want to confirm that the parties have received and
 3    reviewed each of these submissions.
 4              Mr. Mazurek?
 5              MR. MAZUREK:  Yes, we have, your Honor, with our
 6    client.
 7              THE COURT:  All right.  Mr. Wolf?
 8              MR. WOLF:  Yes, we have, your Honor.
 9              THE COURT:  All right.  Are there any other
10    submissions that I did not mention?
11              MR. WOLF:  We would simply refer the Court to the
12    victim impact statement that was previously submitted by the
13    U.S. Department of Health and Human Services, and that I know
14    the Court has received in connection with other defendants in
15    this case.
16              THE COURT:  Yes.  Thank you.
17              MR. MAZUREK:  And no further submissions other than
18    what your Honor identified from the defense, your Honor.
19              THE COURT:  Okay.  Thank you.
20              Now, Mr. Werczberger requested to seal certain
21    portions of his submissions, and I believe that those
22    applications were resolved, but is there anything further in
23    that regard that we need to address now?
24              MR. MAZUREK:  No, your Honor, not from the defense.
25              THE COURT:  All right.  All right.  Mr. Wolf, I'm
```

O9AUWERS

1   going to just ask this for good measure:  So the PSR indicates

2   that the victim of this offense, as you just mentioned, is the

3   Administration for Children and Families, a component of the

4   U.S. Department of Health and Human Services.  You can confirm,

5   I assume, that ECF has been notified of its rights under the

6   Crime Victims' Rights Act?

7              MR. WOLF:  Yes, your Honor.

8              THE COURT:  All right.  Thank you.

9              All right.  I'm going to turn now to the presentence

10  investigation report.  Mr. Mazurek, you have read the report?

11  Yes?

12             MR. MAZUREK:  Yes, your Honor.  I reviewed with it my

13  client.

14             THE COURT:  Okay.  And, Mr. Werczberger, you have read

15  the presentence investigation report as well?  Is that right?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.  And you discussed it with your

18  attorney?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Have you had sufficient time and

21  opportunity to review the report and discuss it with your

22  counsel?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Have you been able to discuss any errors

25  that you might have seen in the report?

```
1                THE DEFENDANT:  Yes.

2                THE COURT:  Did you discuss with your counsel anything

3     else that you wish him or them to take up with me today at

4     sentencing?

5                THE DEFENDANT:  Yes.  We discussed it.

6                THE COURT:  All right.  Mr. Wolf, you have also

7     reviewed the presentence investigation report, correct?

8                MR. WOLF:  Yes, your Honor.

9                THE COURT:  All right.  Before I turn to the

10    calculation of the sentencing guidelines, I just want to

11    discuss the factual and overall accuracy of the PSR.  Now, I

12    did review the objections reflected in the addendum and I

13    reviewed probation's responses to those objections and I find

14    them to be appropriate.  I also want to point out that there is

15    a statement on page 33 of the PSR that is -- that is not

16    correct, and I have confirmed this with probation.  In the last

17    paragraph on page 33 it says:  As such, in taking all factors

18    into consideration, we maintain that a sentence of time served,

19    a variance below the prescribed advisory guidelines range is

20    appropriate in this case pursuant to the factors outlined in

21    18, U.S.C., 3553(a).  The language of variance below the

22    prescribed advisory guidelines range is incorrect.  I'm going

23    to strike it.

24                And, Officer McMahon, I would ask that probation issue

25    a corrected version of PSR, omitting that language.
```

O9AUWERS

1          MR. MAZUREK:  Thank you, your Honor.

2          MS. McMAHON:  Yes.

3          THE COURT:  All right.  Mr. Mazurek, I saw your

4     footnote in your submission going to this point, but I want to

5     confirm it's your view that the PSR is factually accurate?

6          MR. MAZUREK:  Yes, your Honor.

7          THE COURT:  All right.  And, Mr. Wolf, does the

8     government have any objections?  Or do you believe the PSR to

9     be factually accurate?

10          MR. WOLF:  We do believe it to be factually accurate.

11          THE COURT:  All right.  Aside from the revision that

12    we just discussed, and that will be made in the report, I'm

13    going to adopt the factual recitation set forth in the

14    presentence investigation report including the changes that

15    probation incorporated into the report reflected in the

16    addendum, the presentence investigation report will be made

17    part of the record in this matter, it will be placed under

18    seal.  If an appeal is taken, counsel on appeal may have access

19    to the sealed report without further application to the Court.

20          I am now going to turn to the calculation of the U.S.

21    sentencing guidelines in this case.  I am not bound by the

22    guidelines, that is to say, they are advisory, but I do have to

23    accurately calculate the guidelines range and consider what the

24    guidelines recommend before imposing an appropriate sentence.

25    As an initial matter, I not that the November 2023 United

O9AUWERS

1    States sentencing guidelines control.

2         The parties' plea agreement calculated a total offense

3    level of 6.  Probation, however, calculated a total offense

4    level of 8.  In the government's submission the government

5    acknowledges that probation correctly calculated a total

6    offense level of 8, rather than, as the parties did in the plea

7    agreement and an offense level of 6.  The dispute concerns

8    2B1.1(b)(9)(A) of the guidelines which provides that if the

9    offense involved a misrepresentation that the defendant was

10   acting on behalf of a charitable, educational, religious, or

11   political organization, or a government agency, it increased by

12   two levels, if the resulting offense level was less than a

13   level 10, it increased to level 10.  Here I find that this

14   factor is met.  Accordingly, the Court agrees with probation

15   that the total offense level is 8.  I note, however, as

16   probation observed, that despite the difference between the

17   offense level reflected in the plea agreement and that set

18   forth in the PSR, each yields a guidelines range of 0 is six

19   months' imprisonment.  I also note the government's statement

20   that it stands by the stipulated guidelines calculation

21   reflected in the plea agreement and further that the different

22   offense level calculations do not impact the custodial

23   guidelines range in any event.

24        As stated, I have calculated an offense level of 8.  I

25   have also calculated a criminal history category of I.  This

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9AUWERS

1    yields a guidelines range of zero to six months' imprisonment,

2    a supervised release range of one to three years, and a fine

3    range of $2,000 to $20,000.

4         The plea agreement incorrectly states, based on

5    erroneous calculation of a guidelines level of 6 that the fine

6    range is $1,000 to $9,500, as opposed to a range of $2,000 to

7    $20,000.  The government, nevertheless, seeks a fine of $9,500

8    consistent with what's in the plea agreement.

9         In the plea agreement, both parties agreed not to seek

10   a departure from the guidelines range; is that correct?

11        MR. WOLF:  That's correct.

12        MR. MAZUREK:  Yes, your Honor.

13        THE COURT:  I've, nevertheless, considered whether

14   there is any basis for departure, and find that there are no

15   grounds justifying a departure here.

16        With that, I'll turn first to counsel, and then to

17   Mr. Werczberger, if he wishes to say anything.

18        I have read everyone's sentencing submissions, and you

19   need not repeat anything that you've included in those papers,

20   but, of course, you're welcome to tell me whatever you'd like

21   me to hear today.

22        So I'll start with the government.

23        MR. WOLF:  Yes, your Honor.  I won't repeat what's in

24   our sentencing submissions, I'll just short of briefly

25   emphasize a few things.

1          The first is I think what's acknowledged in the PSR as

2   well as, I think at least acknowledged, if not expressly in the

3   defendant's submission, and that is that this particular

4   defendant, at least as noted in the PSR, I think it's described

5   as a happy childhood, a middle-class upbringing with all the

6   basic necessities.  As the sentencing submission notes, the

7   defendant is an extremely successful businessman.  He's the

8   patriarch of his family.  He has a net worth of millions and

9   millions of dollars.

10          I raise all of these to illustrate the point that the

11   defendant here engaged in conduct not because of financial

12   need, as the Court sometimes sees when sentencing defendants,

13   not because of difficult family circumstances, as the Court

14   sometimes sees, and not because he was placed in a difficult

15   position where, at first he may have not understood when he had

16   gotten into and then quickly and slowly realized and simply

17   couldn't get out.  To the contrary, from the government's view,

18   this is a crime of greed and a crime of a defendant believing

19   that the rules that applied to everyone else do not apply to

20   him.  It is a crime a conduct calculating to view government

21   funded childcare as a means to profit, and in particular a

22   means to profit without regard to following the rules, without

23   regard as a board member of a head-start agency entrusted to

24   guard against waste, fraud and abuse, without regard to

25   ensuring that services are being delivered and without regard,

1    I would note, for who else might suffer or be affected

2    negatively for the conduct.  And here I will note, that as part

3    of the defendant's conduct, it's not part of the offense

4    conduct, it's not part of the lies that were told to the bank

5    but part of the facts and circumstances relevant to the offense

6    that the defendant swept in his wife and grandson in this

7    conduct, which, in the government's view, is further evidence

8    of the defendant having taken a reckless approach.  And one,

9    again, that viewed himself on different footing than others.

10        All of this is very concerning to the government and

11   worthy of just punishment.  There's a need for the sentence

12   imposed to reflect the history and characteristics of the

13   defendant that I just raised to reflect that the defendant knew

14   better and that his crime was committed without, as I said,

15   regard for the rules.  His crime was committed in a manner that

16   it was simply okay to lie to a bank in order to obtain a bank

17   account.

18        There is a need for general deterrence.  There is a

19   need to promote general deterrence so that the broader of

20   community of would-be or current members of head-start boards

21   know that consequences will follow if they abdicate their

22   responsibilities.

23        And there's a need to promote specific deterrence to

24   ensure that this particular defendant will not be tempted to

25   reoffend.

1            As I said before, from the government's perspective,

2     there really is a need here to promote respect for the law, a

3     need to promote the notion that all defendants, no matter their

4     socioeconomic status will be treated equally before this Court

5     and all other Courts.

6            The government has taken into account all of the

7     3553(a) factors in coming up with its recommendation.  We have

8     recommended, we agree with probation that this defendant need

9     not be incarcerated.  However, we do take the view that in

10    service of all of the 3553(a) factors that some period of home

11    detention is appropriate.  We have recommended six months of

12    home detention as well as a fine at the top of the parties'

13    stipulated guidelines range.

14           Unless the Court has further questions, the government

15    respectfully refers to our papers.

16           THE COURT:  All right.  Thank you, Mr. Wolf.

17           Mr. Mazurek?

18           MR. MAZUREK:  Yes, Judge, we have -- we're going to

19    bifurcate our presentation.  Ms. Haramati is going to speak on

20    the issue of the nature and personal characteristics of the

21    defendant and I'll speak on the remainder of the 3553(a)

22    factors, if that's okay with the Court.

23           THE COURT:  Yes.  Very good.

24           MS. HARAMATI:  Thank you, Judge.  If it's okay with

25    the Court, I'm going to just go to the podium.

O9AUWERS

1            THE COURT:  Sure.

2            MS. HARAMATI:  All right.  Thank you, Judge.  As

3    Mr. Mazurek said, I'll be addressing the personal history and

4    characteristics of Mr. Werczberger, which really provides an

5    anchor for all federal sentencing.  You know, the sentencing

6    statute, as the Court knows, of course, better than I do,

7    directs the Court to impose a sentence that is sufficient but

8    not greater than necessary, and that, of course, means

9    sufficient but not greater than necessary, not just for the

10   crime, not just for the offense conduct, but for the person.

11           So the salient question for the Court today is not

12   just the contours of the conduct that Mr. Wolf addressed and

13   that Mr. Mazurek is going to address, but -- and it's not just

14   even the sentencing guidelines, but the question is who is Ben

15   Werczberger.  He's a superlative person looking beyond this

16   offense conduct.  The government mentioned Mr. Werczberger's

17   success and his family.  His success and his beautiful family,

18   many of whom are here today, his -- all three of his children,

19   Jacob, Pessi, and Esther are here, as well as their spouses,

20   his wife, Miriam, and literally dozens of grandchildren and

21   their spouses are here to support Mr. Werczberger, and that --

22   what he has been built, both in his business success, which

23   I'll address, and his family, is his own merit, it's through

24   his own hard work.

25           I know the Court carefully reviewed all of our

1  submissions and the letters, so I won't rehash that, but I've
2  gotten to know Mr. Werczberger pretty well over the last almost
3  two years.  So there are a couple of things that I just want to
4  highlight for the Court in crafting a sentence of what is
5  sufficient but not greater than necessary for him and why a
6  period of home detention, we submit, is greater than necessary
7  for this -- for this person.

8          There are three attributes that I think really capture
9  Mr. Werczberger's true essence:  It's his grit and his
10  commitment to hard work.  He has a heart for charity and
11  community service throughout his life.  And he has an unmatched
12  dedication to his family, which is his first priority.  It's
13  his pride and it's his joy.  That package of attributes and the
14  positive impact that Mr. Werczberger has had on those around
15  him, his employees, his community members and his family, all
16  support a sentence of time served without any further
17  restrictions on his liberty.  This is an extraordinary man who
18  is already going to carry for the rest of his life the
19  indelible burden of his felony conviction.

20          Your Honor, Mr. Werczberger grew up in a home of
21  modest means.  It's true he wasn't -- he didn't struggle
22  financially or want for food, but he was a son of two Holocaust
23  survivors who lost everything, and despite that, his parents
24  never gave up.  They rebuilt their entire lives from scratch.
25  And Ben learns from his parents' example.  He saw that if they

O9AUWERS

```
1    could persevere and overcome the unthinkable horrors and the
2    unimaginable loss that they endured, he can also persevere, and
3    that is exactly what he did when he faced life's challenges.
4    He took inspiration and example from his parents.  When Ben was
5    tested as a young man, he had several severe health challenges
6    that put him into significant medical debt that jeopardized the
7    stability of his family when his children were just babies, you
8    know, many would have despaired under those circumstances, but
9    that's not Ben.  Ben took on a second job.  He walked
10    door-to-door peddling copy supplies and other office supplies
11    and several nights a week he slaved over a hot oven working as
12    a baker.  Through his grit and his perseverance Ben regained
13    financial stability to his young family.  It was not something
14    that he could take for granted or something that he was born
15    into.  And he's taken the lessons of his youth and his parent's
16    house to heart.  He imparts them to his grandchildren and
17    hopefully he'll impart them to his great grandchildren when
18    they grow up.  Ben's granddaughter, Rachel Dembinsky, I think
19    puts it in an especially nice way, she wrote in her letter that
20    she can see from the twinkle in her grandfather's eye that he's
21    proud of his hard work when he looks back and he recounts those
22    days when he struggled.  He's not resting on his laurels.  He's
23    using his own struggles as an example.
24         In middle age, after he faced years of financial
25    struggle, Ben built a successful business.  He accomplished
```

1    that through persistence, through hard work, through

2    creativity, and importantly, he accomplished that through

3    listening to the opinions of his peers, his partners, and his

4    employees.

5            One of -- I want to just note for the Court that one

6    of the letter writers, Herman Goldberger, who is Ben's partner

7    of more than 30 years, is also here before the Court today to

8    support Mr. Werczberger.  It was a personal endeavor for him

9    building this business and struggling.  About 30 years ago, a

10   little, more Ben found a founded Tiger Supplies.  At the time

11   it was a novel idea.  It was the first ecommerce business that

12   sold wholesale architectural supplies.  And with that good idea

13   and with that persistence, Tiger took off.  It has numerous

14   divisions now that sell a pretty surprising array of different

15   kinds of products, professional durable, medical equipment,

16   kitchen cabinet supplies, janitorial supplies, among like --

17   among many others, and Tiger now currently employees

18   approximately 100 employees, all of whom over the decades have

19   looked to Ben for stable jobs and a workplace that cares about

20   them and allows them to thrive, because that's the kind of boss

21   that Ben has been throughout his time.

22           Ben's son, Jacob, who is also here, has seen that

23   firsthand working for his father over the last 30 years.  He

24   recounted for the Court in his letter, I just want to

25   highlight, the real humanity that Ben conducted himself with at

O9AUWERS

 1    work.  Jacob writes that Ben never raised his voice at a

 2    coworker, a customer, or a vendor, no matter how stressful the

 3    day was.  Jacob now runs the company because Ben had to step

 4    down as part of the consequences of his felony indictment and

 5    felony plea, just because of the realities of the business

 6    world made it impossible for him to continue running the

 7    company with those marks on his record.  And Jacob, who is now

 8    at the helm, tries to emulate his father.  He knows that his

 9    father was the go-to guy for the employees because of the

10    person that he is, and Jacob also is striving to be that same

11    kind of boss that he saw his father be over -- over the

12    decades.

13             You know, another aspect of Ben that I think is really

14    a hallmark of who he is, is charitable work and his community

15    service.  Throughout his life Ben's record shows that he had an

16    understanding that any success he had was dependent on the

17    support of others in the community.  He knows he can't go at it

18    alone, and so he knows that he has to give back because nobody

19    can go at it alone.  So Ben has always prioritized charity and

20    community service as part of his very ethos.  He has a record

21    of literally decades of assisting those in need financially and

22    beyond financial help, devoting his time, leveraging his

23    connections, and his creativity in order to help organizations

24    and people, not just pay for things, but also run organizations

25    efficiently in order to provide the most good for the most

O9AUWERS

1  people.  You know, he also showed through his own actions, even

2  when he was a struggling -- struggled financially as a young

3  man that charity begins at home, and for him that wasn't just a

4  mantra or a nice saying to repeat to his children every now and

5  again.  It was his reality and his guiding principle.

6  A.  I thought that there was one particularly touching story

7  that I would just note for the Court. His daughter, Ben's

8  daughter, Pessi, who is sitting here in the front row, recalls

9  when she was a young girl and when Ben was just a young father,

10  he and his wife opened their home, which was just a few blocks

11  from my Maimonides in Boro Park to members of the community who

12  couldn't make it home when they had a loved one who was

13  hospitalized and members of the Orthodox Jewish community who

14  wanted to stay close by the hospital on shabbos when it was not

15  possible because of the sabbath restrictions for them to travel

16  to and fro to the hospital.  They literally had, as a Pessi

17  describes, every week somebody staying in their home, and

18  somebody sharing in the family's sabbath meal, a festive meal,

19  becoming part of the family, every single week.  Ben made his

20  charity a reality an example every single day.

21          You know, as part of our sentencing submission, and I

22  won't rehash this, we submitted about half a dozen letters from

23  charitable organizations that Ben has devoted his time and his

24  financial resources to.

25          And, you know, just coming before the Court, I find it

1    notable that each of these organizations doesn't talk about

2    Ben's recent contributions, Ben's recent activity.  They talk

3    about his long-standing activity, his long-standing investment

4    and commitment for their organizations because, you know, Ben

5    is not somebody who just started taking up charitable work when

6    he saw that he was in trouble.  He has been doing this his

7    entire life, and he -- for him it is a part of who he is,

8    community service and doing what he can for others.

9            You know, I find, you know, the most touching and most

10   illuminating aspects of Ben's community work to be the personal

11   stories of individual help.  There were, I think, dozens of

12   those kinds of stories that his family, his friends, and

13   community wrote about in their letters.  They -- his children,

14   his grandchildren wrote about how Ben routinely drops

15   everything whenever he can help, just not just his kids, not

16   just grandkids, not just those closest to him, but his distant

17   family members, his friends of friends, employees, people in

18   the wider community.  Ben's grandson, Michael Friedman, who I

19   believe is here today, talks in his letter about how Ben helped

20   Michael' elderly relative.  This is Michael -- Michael is Ben's

21   grandson-in-law.  So Michael's elderly relative is not really

22   Ben's elderly relative?  It is somebody Ben doesn't even know.

23   When this better than person was stuck in Florida during the

24   COVID lockdowns, you know, when the whole world of fearful of

25   when was going to happen next, Ben dropped everything to help

O9AUWERS

1    this person who he did not know really.  Michael recounts

2    now "Without a second thought, Ben took charge he drove over an

3    hour on several occasions to personally deliver food and

4    whatever else was needed.  When Michael's family member ended

5    up in the hospital all alone, Ben was there to make sure he had

6    everything he needs and was well cared for."

7            That story is not unique to Ben.  It's just one

8    example of many that highlights who Ben Werczberger is,

9    everyone who wrote the Court had something special to say about

10   Ben's community service.

11           Now, one final example of this that I want to

12   highlight is that tremendous work that Ben and his wife have

13   devoted in transforming their community in Deerfield Beach,

14   Florida, which is a retirement community with mostly senior

15   citizens into a welcoming place where every single one of those

16   senior citizens has a place to go and feels welcomed, no matter

17   who they are.  The rabbi of that community of the synagogue

18   who -- he, together with the Werczbergers, runs that community

19   is here today, Rabbi Knobloch.

20           Ben's granddaughter, Shana Dembinsky, who has been to

21   visit, she describes how everybody in the community loves Ben.

22   They don't know everything that he does, they don't know how

23   behind scenes he's working not to make sure that the community

24   has a building or that people -- elderly people have

25   transportation to the synagogue if they can't make it on their

O9AUWERS

own.  But those are things that Ben does without fanfare and
without publicity and he does discreetly and they often go
unnoticed, but Shana, his granddaughter, sees that this is
Ben's very essence, and the community might not know the
details because he doesn't publicize his work but they know the
kind of work that Ben Werczberger is.

            Now, a final aspect of Ben that I think is perhaps the
most important thing that he has done in his life is his
unmatched dedication to his three children, to his wife, to his
more than a dozen grandchildren and to his even more great
grandchildren.  Ben has an unbelievably close relationship with
his children and grandchildren, and that's what makes Ben, I
think, truly special, truly a unique person.  His most
essential quality is being the rock of his family, as his
daughter Esther Dembinsky, I think, put it, really, really,
well.  You know, many fathers are committed to their families,
but I think that it's rare for a 72-year-old man with
middle-aged children, 15 grandchildren, to be the go-to person
for literally everybody.  But that's Ben.  No matter how busy
he is, no matter what else he's doing, his children and his
grandchildren know that they can count on him to put their
needs first.  Even during the pendency of this case and how
stressful and difficult it's been for him, they have counted on
Ben to be there for him first.  I think one of his
granddaughters put it really well in her letter, Rachel Kraus,

1  she had that Ben is her 911, 311, and her first phone call in

2  any emergency.  That's really an extraordinary thing for a

3  grandchildren to feel close enough with their grandfather for

4  him to be there for their concerns and their needs for Ben to

5  be their first line of moral support.

6         You know, Ben's superlative commitment to his family

7  didn't just start when his responsibilities become lesser, you

8  know, that of a grandfather.  They began when he was a young

9  father and when he was struggling to make ends meet, when he

10  had multiple jobs.  His kids though, they didn't know anything

11  about any of that because Ben put them first.  His daughter,

12  Pessi, talks about how she remembers as a child her father

13  could have the best day or the worst day, but we kids could

14  never tell them apart because he was as joyful on the bad ones

15  with the kids as he was on the good ones.  Pessi, I think,

16  really beautifully encapsulates Ben's commitment when she says,

17  my dad dedicates his life to his kids, it doesn't matter what

18  is going on outside of him, if we need him, he is there, along

19  with all of his compassion and all of his grace.  You know,

20  there are literally countless stories in those letters about

21  the little things that Ben has done for his grandchildren, how

22  he was there when one was home sick, how he, you know, took the

23  grandchildren for a special -- special occasions, you know,

24  over the summer, and how I think, really, unbelievably, he

25  escorted each and one every one of his grandchildren who was

1    going to study abroad, he personally took them it study abroad,

2    he took them to the dorm, he bought them their supplies, he was

3    who escorted them into their first step into independence, and,

4    you know, that is the kind of grandfather that he is, a

5    hands-on grandfather who wants to make sure that every single

6    little thing for his grandchildren is going well and is going

7    right.

8            And, you know, I will say, as Ben's wife, Miriam,

9    pointed out in her letter, she says amazingly, you know, what's

10   amazing is not just that the grandfather wants to spend that

11   kind of time with the grandchildren, is that the grandchildren

12   want to spend that kind of time with elderly grandfather when

13   they're, you know, teenagers and budding young adults.  Miriam

14   wrote the Court, amazingly, as teenagers and young adults, the

15   grandchildren wanted to make that trip and transition to school

16   and life abroad with their grandfather because that's the kind

17   of close relationship that Ben has invested in every generation

18   of his family, and he has a profound impact on his

19   grandchildren and on his children.  His son has taken over his

20   business.  And his grandchildren write how his commitment to

21   hard work and his advice in their own career paths when they

22   have struggled in making decisions in their own lives, his

23   advice and his -- his inspiration is there for them.

24           His granddaughter, Riki, who is here, she says that

25   her grandfather's words of advice and encouragement follow me

O9AUWERS

1    wherever I go.  That is the kind of rare bond that Ben can only

2    have built through time, through investment, and through real

3    care.  Few people in this world are as lucky as Ben

4    Werczberger's grandchildren to have the kind of grandfather

5    that he is, who has devoted time, energy, to nurture every

6    single one of them independently like a second father.

7            And this is the testament to Ben as a true patriarch.

8    He's at patriarch because he happens to have many children and

9    grandchildren.  He is the real deal.  He's a family man.  And

10   he has put his money where his mouth is throughout his entire

11   life.

12           You know, as a family man, Ben has naturally, and I

13   think quite painfully, opened up to his family about his guilt

14   and his remorse in this case.  He came clean to them about his

15   mistakes as several of his children and friends wrote about in

16   their letters, but, you know, what I think is particularly

17   noteworthy is not just what Ben said to them but it is that

18   because of their close relationship with Ben they can see his

19   remorse expressed without, you know, without him speaking, they

20   see it beyond just his words, that he's taken his criminal

21   conduct seriously and that he's sorry for what he did.

22           These past 18 months, his daughter, Esther, writes,

23   these past 18 months have really taken a toll on Ben.  This

24   mistake has been a huge burden to bear and a tremendous source

25   of shame that he's struggling with daily.

O9AUWERS

1          And Miriam Werczberger, Ben's wife, who is the closest

2     person to him in this world, she recounts that just knowing

3     that Ben did wrong and the toll it's taken on their children

4     and grandchildren has been immensely hard for Ben.  He's always

5     tried to set a good example for them and it pains him deeply

6     knowing that he failed at the most important aspect of his

7     life.  Miriam writes, I see the anguish and the fret that

8     plagues Ben when he doesn't know I'm looking.

9          Ben's family has seen for the last two years how he

10    has internalized his crime.  And that's the real view of Ben

11    Werczberger.  Looking at who Ben is, looking at his life story,

12    pulling himself up and building something successful through

13    his hard work, looking at his dedication to his community and

14    sharing the success that he enjoyed long before this case ever

15    started and looking at his quintessential nature as a family

16    man taken together, I submit, your Honor, that this felony

17    conviction and a time-served sentence without more are

18    sufficient but not greater than necessary for the person who

19    Ben Werczberger really is.

20          And with that, I will turn over the rest of the

21    presentation to Mr. Marks.

22          THE COURT:  All right.  Thank you, Ms. Haramati.

23          MR. MAZUREK:  Judge, I just want to say a few words on

24    the remaining 3553(a) factors and really focus on the

25    differences between the parties in terms of what we are

1    requesting the Court to do at sentencing.

2            First, I would like to speak on the seriousness of the

3    offense and what Mr. Wolf was talking about the need to promote

4    due respect for the law and just punishment.  There is no

5    question, your Honor, that Mr. Werczberger is embarrassed,

6    humiliated, and extremely remorseful for in any way causing the

7    Court, the DHHS, the community, the government, the

8    prosecutor's office to believe that he in any way wished to

9    endanger the welfare of the schools -- of the school that he

10   lent considerable amounts of money to.  He is absolutely

11   remorseful for taking what was at the time using extremely bad

12   judgment to take self-help measures to get a direct payment

13   from Project Social Care into a bank account in the New York

14   City and making those false representations to the bank and

15   doing so.

16           He did that, your Honor, but in the -- I think it is

17   important for you to understand the context in which he did.

18   Mr. Werczberger was not in the business of early daycare or

19   childcare at all.  That was not his business.  His business, as

20   Mr. Haramati spoke of at length, was developing the company as

21   he did for a whole generation, 25 years of wholesale

22   distribution company in different areas.  He decided to take

23   the risk that he did, the business risk he did by lending

24   significant money to the New York City Early Learning Company,

25   because he believed in it.  He did the diligence.  He visited

O9AUWERS

the school.  He saw the facilities.  He was impressed by the
ratio of day care providers to children.  He was impressed with
the school facilities for kitchen and providing nourishment for
the children.  He was impressed with the therapy and medical
services that they provided.  And for a period of time, he
extended large amounts as one of the main creditors to New York
City Early Learning.  He did that because -- not because he in
any way wanted to steal money from the company, he wanted to
make -- he wanted to provide money for the company to continue
to provide and believed it to be a good and reasonable business
risk in doing that.

         He made a great error in November of 2019, which, you
know, he has regretted ever since, and for which he is being
rightfully punished today in this courtroom by taking that
self-help measure and opening the bank account and taking a
check directly in order for repayments of that loan.  He did
that because he extended -- he went beyond his comfort zone.
He went from two and a half to three and a half million and was
concerned about repayments.  But, your Honor, what
Mr. Werczberger wants the Court to know, wants the government
to know, and wants his family to know, and he's been trying to
explain, he never intended went to do any harm to the school,
in fact, the school itself, a for-profit company, showed that
it provided quality day care, not just early health care, early
head-start kids, but also to a number of other kids from

O9AUWERS

1    grades -- three-year-olds awe all the way up to the

2    five-year-olds.  He is very sorry for putting the organization

3    and that head-start program in any theoretical conflict based

4    on the credit that he extended to the school itself.

5            But let me say, your Honor, that with respect to the

6    punishment that is just and requires due respect for the law

7    and for deterrence purposes, I certainly think, you know, with

8    respect to the specific deterrence you have a 72-year-old

9    grandfather, great grandfather, and father, who I don't think

10   there's any concern -- should be any concern that he would ever

11   get close to this kind of conduct ever again.  The lesson has

12   been learned and learned considerably.  In terms of the

13   punishment and general deterrence, you know there are different

14   defendants who were charged in this case in terms of the level

15   of culpability that the government has already indicated,

16   Mr. Werczberger obtained this plea agreement because they found

17   him to be on the lower end of the culpability scale.

18           Your Honor has already sentenced one other defendant

19   in this scheme, Ms. Wong, and she was convicted also for the

20   same kind of conflict of interest as Mr. Werczberger.  She

21   received misdemeanor.  And, obviously, there is a very

22   considerable difference between a misdemeanor penalty and a

23   felony conviction.

24           You know, what Mr. Haramati said couldn't be more

25   striking in terms of the fact that one of the traits that

O9AUWERS

1    Mr. Werczberger takes so much to heart is his being the rock

2    for his family.  He destroyed all of that in the judgments he

3    made in this case.  Even Mr. Wolf identified him as the

4    patriarch.  One of the things that Mr. Werczberger really

5    always intended was to be that person that could be relied upon

6    for doing not just the right thing financially for the family

7    and building a business from scratch, coming from only a

8    Yeshiva education and no college and no real high school, he

9    wanted to make sure that in addition to providing that kind of

10   stability he also would provide moral judgment stability and he

11   failed them in that regard.  It's not just that personal

12   punishment that he faces, but the felony conviction, which, as

13   your Honor knows, unfortunately, in today's society is a

14   scarlet letter that you never -- that never leaves you.  Mr.--

15   the collateral consequences of that felony conviction are

16   serious, severe, and practically real.  Mr. Werczberger had to

17   give up the company that he ran for over 23 years at the time

18   of his arrest.  Why?  Because banks found him no longer -- a

19   good credit risk, he was kicked out of banks, mortgages -- the

20   mortgage banks started to foreclose on his properties, he even

21   was losing the full term life insurance policies that he

22   financed for long.  So these are real day and actual

23   consequences of a felony conviction.  And they should not be

24   taken lightly.

25            The real question, your Honor, I think the only

O9AUWERS

1  question that comes -- that the parties diverge on in our

2  aspect of what we believe is a just and reasonable sentence

3  under the Section 3553(a) factors and the clause is any special

4  condition of release.  Certainly, we defer to the Court as to

5  whatever financial penalty you think is appropriate in order to

6  give due credit to the Sentencing Reform Act's requirements.

7  The special condition that the government seeks is a six-month

8  home detention period, your Honor, and I believe that that is

9  not necessary given the first one is sufficient but not greater

10  than necessary under that statute.

11      Also, your Honor, in determining special conditions,

12  as indicated in the government's sentencing memo at note 5 on

13  page 9, the Second Circuit has taken a particular interest in

14  sort of defining the contours of the discretion that a

15  sentencing Court should have in determining what is a

16  reasonably related special condition to the nature and

17  circumstances of the offense and the personal history and

18  characteristics of the defendant, and that's in Section 5D1.3

19  of the sentencing guidelines.  We believe that this additional

20  deprivation of liberty that the government requests is not

21  reasonably related to these objectives.  I think your Honor

22  would be better suited to use the vitality of this 72-year-old

23  great grandfather who has done great things in his life but

24  made really bad judgments with respect to this loan to New York

25  City Early Learning and how he took the self-help measures to

O9AUWERS

1    protect himself from that.  Your Honor, you can use that

2    vitality and not just say that he should be at home, he

3    would -- he loves to be home with his beautiful wife,

4    obviously, and children and grandchildren but your Honor can

5    add a condition which is more reasonably related to the offense

6    conduct and to this particular defendant, and that is to add a

7    community service obligation and requirement that connects

8    perhaps to the educational industry, for which he was supposed

9    to volunteer and give his good-faith volunteer service as a

10   board member of the head-start program.

11         So for all of those -- for those hours that he may

12   have not provided -- you know created that potential conflict

13   of interest, your Honor can issue a special condition of

14   probation or a supervised release that puts him back into the

15   community to give back.  As Ms. Haramati said, Mr. Werczberger,

16   he's 72 years old, he has some health problems, as indicated in

17   the probation report, he's had a hip replacement and he needs

18   to go his knee replaced, but, you know what, what he wants to

19   keep going, but, your Honor, instead of making him stay at home

20   for six months, which can only do, I think, more mental health

21   damage to him, I would ask that the Court consider putting him

22   back out into the community, community service that the

23   probation department can recommend to enable him to give back

24   and do the kind of good things which his entire life has been

25   structured around.

O9AUWERS

1          Sometimes good people do bad things, your Honor, and

2     that is what the situation is, I respectfully submit is what

3     happened here to Mr. Werczberger.  But, your Honor, he is being

4     punished.  No doubt about it.  A felony conviction is

5     substantial.  All the parties, I think, including the probation

6     department, understand that there is no need to incarcerate

7     Mr. Werczberger for this conduct.  That would go beyond what

8     is -- what would be greater than necessary under the Sentencing

9     Reform Act, but if the Court is considering special conditions

10    beyond the standard conditions, we would ask that it tailor

11    that special condition to something that is more apropos to the

12    kind of offense conduct that Mr. Werczberger committed and also

13    is consistent with his personal history and characteristics.

14         Your Honor, with respect to the financial penalty,

15    Mr. Werczberger has been brought a certified check, a bank

16    check, to court.  He has a signed a consent order of

17    restitution in the amount of $177,000 -- $177,075, which

18    represents every penny of interest that he received from the

19    New York City Early Learning loan that was part of the offense

20    conduct here.

21         I also state just for the record, Mr. Werczberger

22    didn't receive the full repayment of principal from New York

23    City Early Learning.  He still had -- so this turns out he did

24    not gain anything financially from this conduct at all, and as

25    I've said, he understands and accepts his responsibility and

O9AUWERS

 1   his financial penalty is being paid on the very day of

 2   sentencing.

 3          So, your Honor, with that, I would ask again that the

 4   Court consider an alternative to what the government proposes

 5   in terms of its special condition of probation.  We believe

 6   that we -- that the probation department's recommendation not

 7   to include such an additional deprivation of liberty should be

 8   also given credit by the Court.  And so we ask that the Court

 9   sentence -- we respectfully submit that the Court sentence

10   Mr. Werczberger to time served two years of supervised release

11   with the special condition of community service as opposed to

12   what we believe would be wasting the assets of Mr. Werczberger

13   in home detention.

14          We thank you.

15          If there are any questions, we are available.

16          THE COURT:  Yes, Mr. Mazurek, I have a couple of

17   questions for you.  Community service had been on my mind also.

18   However, I -- from the PSR and from the defense's submission,

19   my understanding is that Mr. Werczberger is a very religious

20   person and that he would be observing the sabbath and various

21   holidays throughout the year.  Is there a way that community

22   service commitment could work?

23          I'd like to hear from Officer McMahon on that as well.

24          Is there a way that community service requirement

25   could work in a situation where we have a person who, for

```
 1    religious reasons, needs to be away from that commitment from
 2    time to time to carry out his religious obligations?
 3            Why don't you speak to that, if you want to,
 4    Mr. Mazurek.
 5            And I do want to hear from Officer McMahon as well.
 6            MR. MAZUREK:  Yes, your Honor.  Having represented
 7    other members, in fact, of this community, I do know that
 8    community service is something that -- I mean, there are
 9    organizations, one, that can help interface with probation, the
10    Aleph Institute is one, it's A-L-E-P-H, that deals with helping
11    people complete their sentences in probation, supervised
12    release and community service, etc.  They can interface to
13    enable, to give enough advance time warnings to the
14    organization or to carve out a schedule to ensure that whatever
15    community service is being provided can be done in a way that's
16    also consistent with his religion obligations and doesn't in
17    any interfere with or make the community service less
18    effective.
19            THE COURT:  Okay.  Officer McMahon.
20            MS. McMAHON:  We would -- as far as like what the
21    community service would look like, we would defer to the office
22    that would be supervising him, the officer that would be
23    responsible for overseeing his supervision.  From our
24    standpoint, if the Court were to impose community service, we
25    would be looking at the number of hours that should be imposed.
```

O9AUWERS

1   And, generally, I believe it's 100 hours per year is like the

2   standard.  So, given that, there should be enough flexibility

3   if there was, you know, a holiday or religious observance, it

4   wouldn't be something so onerous, not something he would be

5   doing seven days a week, that that couldn't be worked out.

6           THE COURT:  I see.

7           MS. McMAHON:  And I'm sure the officer would be

8   looking to match the defendant up with a place that would --

9   you know, where you could utilize his skills, you know, but,

10  again, we would defer to the office that would be supervising

11  him and that officer.

12          THE COURT:  All right.  Thank you.

13          And, Mr. Mazurek, I also wanted to ask you, you

14  referred to the consent order of restitution, which I do have

15  here, and I will sign on today and put on the docket, but you

16  also said something, I'm paraphrasing now, but something like

17  whatever financial penalty the Court sees fit to impose.  Did I

18  have that right?  Am I understanding that you do not object to

19  a fine that's higher than $9,500?

20          MR. MAZUREK:  We do not, your Honor.  If the Court

21  believes that is necessary in order to satisfy the Sentencing

22  Reform Act, that is correct.  And we do, you know, think that

23  that -- again, in asking Court to construct an overall sentence

24  that is not sufficient but greater than necessary as part of

25  the analysis that we ask the Court to consider in -- as opposed

O9AUWERS

1    to what the government has requested for purposes of this home

2    detention because we do believe that the home detention is not

3    necessary here, and is not going to fulfill the kinds of

4    factors or be consistent with the factors under 3553(a).

5            And if I didn't say it before, the other thing about

6    home detention, your Honor, is that it doesn't punish

7    Mr. Werczberger as much as it does others.  I mean, he has

8    responsibilities to the 15 grandchildren and 17 great

9    grandchildren.  He has responsibilities to the -- there are

10   over -- there are about 100 employees of Tiger Supplies, and

11   sometimes his son, who was thrust into this business at the

12   time of Mr. Werczberger's arrest, he needs to be on site to

13   help with the administration of that business, and he also --

14   you know, he's founded a synagogue in Florida that also he's

15   responsible for the operations of.

16           All of these things, you know, I do know that there is

17   a need for the seriousness of this offense to be punished

18   justly, but we just believe that that particular special

19   condition is not necessary given the requirements of 5D1.3 of

20   the guidelines and the Sentencing Reform Act.

21           So, if an additional financial penalty, an amount of

22   community service, we believe those things are more reasonable

23   and appropriate for purposes of sentencing this defendant.

24           THE COURT:  All right.  All right.  Thank you.

25           Mr. Werczberger, would you like to say anything?

O9AUWERS

 1    You're not required to speak, but you're invited to do so, if

 2    you wish.

 3             THE DEFENDANT:  Can I say it from here?

 4             THE COURT:  You may.

 5             THE DEFENDANT:  Your Honor, speaking to you is one of

 6    the hardest things I've ever done.  Admitting my mistakes and

 7    facing the harms that I've brought upon my family is painful in

 8    a way I cannot describe.

 9             Judge, I'm a family man.  My pride and joy in this

10    world is being there for my wife --

11             THE COURT:  Can he have a bottle of water?

12             THE DEFENDANT:  My children, my grandchildren, and my

13    great grandchildren, I want to make sure that they know --

14             THE COURT:  Do you want to take a moment?

15             THE DEFENDANT:  The last thing I want is to have my

16    children and grandchildren worry about me but I know on this

17    case, I've caused everyone so much heartache.  Every time I

18    speak to my family, I hear in their voices and I see in their

19    eyes that they're afraid of what's going to happen to me.  We

20    can't be together, my children and grandchildren.  The anxiety

21    over my futures, it's unbearable that my actions caused my

22    family such stress.

23             I spent a lot of time in my almost two years since my

24    arrest from my just worrying over how I could have made such a

25    stupid decision.  I should have followed all of the rules more

O9AUWERS

1   carefully and not jeopardized my family's happiness, not cast a

2   shadow on everything I've built over the last more than

3   50 years.

4        Your Honor, I worked very hard for what I have.  As a

5   young man, I went through several health crisis, worked

6   multiple jobs that was physically draining and not paying much.

7   I spent careful years budgeting to support my family of three

8   beautiful children, providing the stable home and still repay

9   my debts that weighed on me for years.  Finally, after working

10  hard for 20 years, I paid off all my debts.  I struggled and

11  set up a new business, which is still thriving today without me

12  though.

13       Managing a successful business has its own challenges.

14  Finding ways to grow the business without taking too much debt

15  and risking everything and hiring the right employees who we

16  could trust fully.  My business was my pride.  Having good

17  credit, a stellar reputation, a stable company that supports my

18  family was what I worked for so many years.

19       Because of my mistakes and the crime I'm here for

20  today, my reputation is shattered.  My credit is ruined.  I've

21  had to give up my business I've worked decades to build because

22  my name and my crimes spoils everything I touch.

23       And the worst part is I know my children and

24  grandchildren and great grandchildren can't look up to me as a

25  role model.  I can't tell my family that I hope they follow in

O9AUWERS

1    my footsteps.  I hope they don't.  My mistakes, I failed them.

2    I failed myself and I'm sorry for that.

3            Thank you, your Honor, for listening.

4            THE COURT:  All right.  Thank you.

5            I'm just hope you'll bear with me for a couple of

6    minutes while I think about what I've heard today.

7            (Pause in proceedings)

8            THE COURT:  Counsel, is there any reason why should

9    sentence should not be imposed at this time?

10           MR. MAZUREK:  No, your Honor.

11           MR. WOLF:  No, your Honor.

12           THE COURT:  I am now going to describe the sentence

13   that I intend to impose.  I will give the lawyers an

14   opportunity to make legal objections before the sentence is

15   actually imposed.

16           In imposing a sentence, I am required to consider the

17   factors that are set forth in 18, U.S.C., Section 3553(a).

18   These factors include:  First, the nature and circumstances of

19   the offense and the history and characteristics of the

20   defendant; second, for the sentence imposed to advance the

21   purposes of sentencing, namely, to reflect the seriousness of

22   the offense, promote respect for the law, and to provide just

23   punishment for the offense, to afford adequate deterrence to

24   criminal conduct, to protect the public from further crimes of

25   the defendant, to provide the defendant with needed

O9AUWERS

1    educational, vocational training, medical care, or other

2    correctional treatment in the most effective manner; third, I

3    must consider the kinds of sentences available; fourth, the

4    guidelines range; fifth, any pertinent policy statements;

5    sixth, the need to avoid unwarranted sentencing disparities;

6    and, seventh, the need to provide restitution to any victims of

7    the offense, although that factor is not applicable here.

8         I've considered the recommendation of probation and

9    the presentence report, the statements and submissions of

10    counsel, and the letters submitted in support of

11    Mr. Werczberger, including his own letter.  I've also

12    considered all of the Section 3553(a) factors, which I just

13    recited.  Ultimately, I am required to impose a sentence that

14    is sufficient but not greater than necessary to comply with the

15    sentencing purposes in the statute.  With respect to the

16    guidelines I've already calculated the applicable range and we

17    have discussed it, so I will not go over that again.  In short,

18    the range in this case is zero to six months' imprisonment.  I

19    will also note that the Court is bound by a mandatory statutory

20    maximum of five years' imprisonment for this offense.

21         Against that backdrop, the defense requests a

22    noncustodial sentence of time served, had previously requested

23    supervised release of six months.  Today, I believe Mr. Mazurek

24    said that the defense does not object to a two-year term of

25    supervised release.

O9AUWERS

```
 1                  Is that correct?
 2                  MR. MAZUREK:  Correct.
 3                  THE COURT:  All right.  The government, for its part,
 4       seeks a guidelines sentence of time served along with two years
 5       of supervised release, subject to a six-month condition of home
 6       detention.
 7                  Probation recommends a sentence of time served and
 8       two years of supervised release.  The report does not speak to
 9       any whether any portion of supervised release should consist of
10       home detention.
11                  Mr. Werczberger, I have struggled a bit to understand
12       your case.  Your counsel's thorough, detailed submission,
13       together with the letters sent by numerous family members and
14       friends portray you as a caring person, as a man of faith, as
15       the patriarch of your family, as a rock, someone who everyone
16       respect and relies on and as a highly successful businessman,
17       who has generously shared his wealth with family and friends in
18       need, with several charities, and has even built a synagogue,
19       the group that is assembled here today underscores all of that.
20       Your work, your generosity to charities and others, your
21       dedication to your family and your success in business make it
22       all the more confounding the turn that you took as you admitted
23       at your guilty plea hearing you agreed with another person in
24       November 2019 to represent to a bank that you were a president
25       of New York City Early Learning Company, although you knew you
```

1    did not have that title, so that the bank would allow you to

2    open an account in the name of New York City Early Learning

3    Company.  Additionally, you allocuted that you knew that was

4    wrong, that the information you provided was false, and that it

5    was provided for the purpose of influencing the actions at the

6    bank.

7            In addition, although I heard from your counsel some

8    points about regret relating to your betrayal of trust and the

9    conflict of interest position that you put yourself in as part

10   of committing the offense conduct, your own comments in your

11   letter to me focused almost exclusively on the impact of that

12   conduct on your family and yourself, not on the impact on the

13   victim in this case, ACF, and on the public.  While it is not

14   unexpected for you to think about the toll on your family and

15   on yourself, I would have expected to hear an expression of

16   remorse for abusing the position of trust that you were put in.

17           With all of that in mind, I must impose a sentence

18   that reflects the seriousness of the offense, promotes respect

19   for the law, provides just punishment, deters you from

20   committing a crime like this again, and deters others from

21   committing this crime.  I have done so while taking into

22   account some mitigating factors, including those acknowledged

23   by the government, that Mr. Werczberger is 72 years old, as

24   well as his relative culpability in this case.  While these

25   factors do not neutralize Mr. Werczberger's criminal conduct,

1    they are worthy of consideration.

2            With all of that said, I will state the sentence I

3    intend to impose.  Mr. Werczberger, after considering the

4    factors set forth in Section 3553(a) of Title 18 of the United

5    States Code, I find that a sentence time served is sufficient

6    but not greater than necessary to comport with the purpose the

7    sentencing.  I will order a term of two years of supervised

8    release to be completed.  In order to reflect the seriousness

9    of the offense, to promote respect for the law, to provide just

10   punishment, and to afford adequate deterrence, I will order

11   that the first three months of supervised release be subject to

12   a condition of home detention.  For those same reasons I will

13   also order a special condition of 100 hours of community

14   service, the specifics of which I will leave to the probation

15   department to recommend.

16           Now, there are a couple of important matters related

17   to home detention.  Mr. Werczberger, while you are on home

18   detention, you will be permitted to attend medical

19   appointments, attend religious services, and attend to any

20   employment related tasks, among other important obligations.

21   This will all be worked out in consultation among you, your

22   attorneys, and your probation officer.  In addition, consistent

23   with the practices in this district your home detention will be

24   enforced through what is called location monitoring so that

25   probation can ensure that you are where you are as needed.

O9AUWERS

1    There are different types of devices that probation might

2    choose to use with respect to location monitoring.  There is

3    location monitoring through GPS, through radio frequency, and

4    through a certain type of phone app.  I'm not going to get into

5    the specifics each of those, that goes beyond the traditional

6    purview of the Court, but what I will say is this:  While I

7    leave it within probation's discretion to determine the type of

8    location monitoring that can be used, under no circumstances

9    shall the form of location monitoring interfere in any way with

10   any religious holidays or observances during which the use of

11   electronics and the like are prohibited.  That is to say, if,

12   for example, a certain form of location monitoring would

13   require that Mr. Werczberger charge the device in the middle of

14   a holiday during which charging devices and other use of

15   electronics is not allowed, then that form of location

16   monitoring is not to be used.  Similarly, location monitoring

17   check-ins with probation should not be scheduled during any

18   hours in which Mr. Werczberger may be observing a holiday where

19   the use of electronics and other practices are not allowed.

20        I will note that what I have just stated is based on

21   information provided by and discussed with the probation

22   department.  In addition, other Courts under similar

23   circumstances have made the necessary accommodations for

24   defendants on home detention and home incarceration for similar

25   reasons.  See, for example, *United States v. Newman*.  That's

 1    S.D.N.Y. Case No. Cr. 439, and *United States v. Nordlicht,*

 2    E.D.N.Y. Case No. 16 Cr. 640.

 3            I'm now going to read the remaining conditions of

 4    supervised release that you must comply with along with other

 5    details of your sentence:  During your term of supervised

 6    release you will be subject to the mandatory conditions set

 7    forth on page 34 of the presentence report.  Those can include

 8    the following:  You must not commit another federal, state, or

 9    local crime.  You must not unlawfully possess a controlled

10    substance.  And you must cooperate in the collection of DNA as

11    directed by the probation officer.

12            As recommended by probation, I am waiving the

13    mandatory drug testing condition.

14            You must not make restitution as I will further

15    discuss with a moment.

16            In addition, the standard conditions of supervised

17    release shall apply.  Those are listed on pages 35 to 36 of the

18    PSR and will be set forth in the judgment.

19            Would you like me to read the standard conditions to

20    you, Mr. Werczberger?

21            MR. MAZUREK:  No.  That's not necessary, your Honor.

22            THE COURT:  All right.  I do want to stress one

23    standard condition of supervision, and that is the following:

24    You must work full-time at least 30 hours per week at a lawful

25    type of employment unless the probation officer excuses you

1  from doing so.  I will, of course, leave it to probation to

2  determine whether you are excused from that condition, but I

3  will note for the record that Mr. Werczberger is retired and

4  has significant financial resources to continue to support

5  himself and any others who may depend on him.  So, to the

6  extent probation deems it prudent to excuse Mr. Werczberger

7  from a mandated number of hours of employment, I support that

8  determination.

9        You must also meet special conditions of supervised

10  release that I will impose in addition to those that I have

11  already discussed.  First, you must not incur new credit

12  charges or open additional lines of credit without the approval

13  of the probation officer unless you are in compliance with the

14  installment payment schedule.  This condition is appropriate

15  given the nature of the crime to which you have been convicted.

16  Second, you must provide a probation officer with access to any

17  requested financial information.  This is to ensure compliance

18  with any sentence regarding restitution.  I'm going to

19  recommend that you be supervised by the district of residence

20  because you may be living in a district other than here in New

21  York.  With respect to a fine, the guidelines range is, for an

22  offense level of 8, is $2,000 to $20,000.  The parties' plea

23  agreement stipulates to an applicable fine range of $1,000 to

24  $9,500.

25        I note, Mr. Werczberger, that you completed a

1   financial affidavit as reflected in paragraphs 80 to 86 of the

2   presentence report.  Based on the information available to me,

3   I conclude that you have not demonstrated an inability to remit

4   a fine.

5          The probation department recommended that I impose a

6   fine of $15,000.  The government, as previously noted, has

7   urged that I impose a fine at the high end of the parties'

8   stipulated guidelines range, a fine of $9,500.  I find that a

9   fine is appropriate under the circumstances.  The defense

10  clarified today that it does not object to a fine that exceeds

11  the top of the range reflected in the parties' plea agreement.

12  I am imposing a fine at the top of the guidelines range for an

13  offense level of 8, which is $20,000.

14         Now, we come to restitution.  The government has

15  handed me a fully executed proposed order of restitution, which

16  I will sign and docket at the conclusion of this proceeding.

17  Additionally, I must impose a mandatory special assessment of

18  $100, which shall be due and payable immediately.

19         Does either counsel know of any legal reason other

20  than anything we have already discussed as to why the sentence

21  should not be imposed as stated?

22         MR. WOLF:  No, your Honor.

23         MR. MAZUREK:  Your Honor, I just have a couple of

24  requests:  Understanding that the three months' home detention

25  must be completed within the two years of supervised release,

O9AUWERS

1    we respectfully do request, if the Court is amenable, if we

2    could delay the period of three months' home detention until

3    November 1st for a number -- a couple of reasons:  First,

4    Mr. Werczberger has a knee replacement surgery scheduled for

5    September 24th, and just for the purposes of maximum

6    flexibility, and less, you know, I guess, coordination with

7    probation, and, secondly, because of the religious holidays are

8    in the month of October this year, for Rosh HaShanah and Yom

9    Kippur and Succoth, that would give Mr. Werczberger again the

10   maximum flexibility of going to different family members' homes

11   during those religious holidays, again, without having to go

12   through, you know, complicated, potentially, schedule --

13   complicated scheduling with probation for home detention.  So

14   we do ask if the Court would consider to start his period of

15   home detention on November 1st of this year.

16           And then we would ask that the residency that he would

17   take up for this period would be his residence in Florida, so

18   we would ask that he be supervised by the Southern District of

19   Florida.

20           THE COURT:  All right.  Mr. Wolf, any response to

21   that?

22           MR. WOLF:  Just give me a moment to confer.

23           THE COURT:  Yes.

24           (Counsel confer)

25           MR. WOLF:  Your Honor, we would leave it to the

1   discretion of the Court.  We've conferred with probation.  The

2   government is in agreement with probation that, as a practical

3   matter, I think that the standard practice would be for the

4   defendant to begin his term of home detention immediately after

5   the sentence is imposed.  We're unaware of any legal reason why

6   that must be the case.  And so with that, we defer to the

7   Court's discretion.

8           THE COURT:  Okay.  Thank you.  That had been my

9   intention.  But for the medical and religious reasons that

10  Mr. Mazurek has cited, I will allow it.  Mr. Werczberger may

11  commence his period of home detention on November 1, 2024.

12          MR. MAZUREK:  Thank you, your Honor.

13          THE COURT:  Mr. Werczberger, for the reasons I

14  previously stated, it is the judgment of this Court that you be

15  sentenced to time served and two years' supervised release.

16  Your term of supervised release will be subject to the

17  mandatory, standard, and special conditions I described.  You

18  are ordered to pay a fine of $20,000 and a special assessment

19  of $100.

20          Before we adjourn, Mr. Wolf, are there any open

21  counts?

22          MR. WOLF:  Yes, your Honor.  And the government

23  respectfully requests they be dismissed.

24          THE COURT:  Okay.

25          MR. MAZUREK:  We join in that application.

O9AUWERS

1          THE COURT:  All right.  I will dismiss the open

2     counts.

3          Mr. Werczberger, I advise you that you have the right

4     to appeal from the judgment imposing this sentence to the

5     extent you haven't waived it.  If you are unable to pay the

6     costs of an appeal, you may apply for leave to appeal *in forma*

7     *pauperis*.  If that application were granted, you would be

8     permitted to appeal without the payment of any fees.  The

9     notice of appeal must be filed within 14 days of the judgment

10    of conviction.

11         Mr. Wolf, is there anything else we should discuss

12    today?

13         MR. WOLF:  No, your Honor.  Thank you.

14         THE COURT:  All right.  Mr. Mazurek, anything else?

15         MR. MAZUREK:  No.  Thank you, your Honor.

16         THE COURT:  All right.  Thank you all.  So,

17    Ms. Haramati and Mr. Mazurek, I wish you well.

18         We're adjourned.

19         THE DEPUTY CLERK:  All rise.

20                              o0o

21

22

23

24

25